**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHWESTERN DIVISION**

| | |
|---|---|
| SAORI QUINN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 3:19-05010-CV-RK |
| | ) |
| | ) |
| JUSTIN LEVI QUINN, | ) |
| | ) |
| | ) |
| Respondent. | ) |

## ORDER BIFURCATING TRIAL
## AND COMPELLING DISCOVERY OF MEDICAL RECORDS

### Petitioner's Verified Complaint

On February 20, 2019, Petitioner filed her Verified Complaint (Doc. 1) for the return of her son L.R.Q. ("Child") pursuant to the International Child Abduction Remedies Act. 22 U.S.C. § 9001, *et. seq.* The Verified Complaint sets forth the following allegations: Petitioner and Respondent were married in Japan on September 5, 2014. Petitioner and Respondent lived together in Japan from September 2013 through May 2018, thereafter, Respondent returned to the United States. Petitioner and Respondent are the biological parents of the Child, who was born in Japan in April 2014. Petitioner currently resides in Tokyo, Japan. Respondent currently resides in Mount Vernon, Missouri. Petitioner and the Child came to the United States to visit Respondent in August 2018. On October 15, 2018, Petitioner returned to Japan without the Child for a medical procedure. At that time, Respondent agreed to send the Child back to Japan on November 6, 2018; however, Respondent failed to return the Child to Petitioner in Japan on November 6, 2018, and at any point thereafter.

On February 20, 2019, Petitioner also filed a Motion to Expedite Hearing and Order that Child Remain in Western District of Missouri (Doc. 3) seeking the following relief: (1) the Court order Respondent not to remove the Child from the Western District of Missouri pending resolution of this matter; (2) the Court order Respondent to surrender the minor child's passports pending resolution of this matter; and (3) the Court set a hearing, as the Court's schedule permits, to decide whether the child should be returned to Japan. The Court held an *ex parte* telephone

conference on February 22, 2019. (Doc. 7.) On February 23, 2019, the Court granted Petitioner's motion. *Id.*

### Respondent's Affirmative Defenses

On February 28, 2019, Respondent filed his Answer and Affirmative Defenses to the Verified Complaint. (Doc. 15.) Respondent alleges the following in his Answer and Affirmative Defenses: Petitioner is unemployed and lives with her mother in Japan. Petitioner was not exercising, and was unable to exercise, her custody rights when the Child was retained in the United States on October 15, 2018, because: (1) Petitioner "can only be with the child under the supervision of another adult for a few hours daily due to a history of extensive mental illness and ongoing treatment," and (2) Petitioner gave up care of the Child to Petitioner's parents and to child care facilities. Beginning in January of 2015, and to as recently as December 20, 2017, Petitioner was voluntarily and involuntarily admitted to an inpatient psychiatric facility for periods of up to two months at a time. These admissions stemmed in part from Petitioner's multiple suicide attempts that included "standing in front of a train, trying to jump off a balcony, and ingesting all of her medication" and Petitioner's domestic violence arrest in October of 2017. In late 2017, Petitioner's medical provider opined in a "medical order" that "Petitioner could not care for [the Child] without direct adult supervision." Respondent left Japan in May of 2018 to reside in the United States. From May 2018 until Petitioner and the Child came to the United States on August 15, 2018, the Child "continued to be cared for at the Izumi Nursery due to Petitioner's inability to care for" the Child. Petitioner consented to Respondent's retention of the Child on October 15, 2018, when Petitioner returned to Japan without the Child "to see her doctor and obtain different medication." If the Child were sent back to Japan at this time, it would "create a grave risk that would expose [the Child] to physical or psychological harm or otherwise place the child in an intolerable situation due to Petitioner's history of abuse and instability" and "Petitioner's extensive history and frequency of mental illness, and her need for ongoing treatment."

On March 6, 2019, the Court set a hearing on the merits (trial) for March 21, 2019. On March 15, 2019, Respondent filed a motion for discovery (Doc. 24) and a motion to continue (Doc. 25). The Court held a telephone conference on March 18, 2019, to address Respondent's discovery and continuance motions. The Court granted in part and denied in part Respondent's motion to continue. In denying Respondent's continuance request in part, the Court ordered the trial to begin as scheduled on March 21, 2019, however, the Court left open Respondent's ability to present

additional trial evidence at a later date. The Court now addresses Respondent's request to bifurcate the hearing. Respondent's request to bifurcate the hearing is **GRANTED in part** and **DENIED in part**. Respondent's motion seeks Petitioner's "medical records from the NTT Medical Center Tokyo from 2015 to present and any medical records form her current mental health physician." (Doc. 24.) Petitioner has already provided a summary of her medical records from NTT Medical Center through November 2017; accordingly, the motion is **DENIED** as to any requests from NTT Medical Center from 2015 through November 2017. The motion is **GRANTED** as to medical records from NTT Medical Center after November 2017 and **GRANTED** as to any other medical records from other providers from 2015 through present. The Court will contact the parties concerning scheduling of the bifurcated hearing.

### Evidence Presented March 21, 2019

**1. Verified Complaint**

As to Petitioner's Verified Complaint, Petitioner presented evidence through Petitioner's medical records, Petitioner's testimony, and Respondent's testimony as follows: Petitioner and Respondent were married in Japan on September 5, 2014. Respondent has recently indicated to Petitioner that he intends to file for divorce. Petitioner and Respondent lived together in Japan from September 2013 through May 2018; thereafter, Respondent returned to the United States. Petitioner and Respondent are the biological parents of the Child, who was born in Japan in April 2014. Petitioner currently resides in Tokyo, Japan. Respondent currently resides in Mount Vernon, Missouri. Petitioner and the Child came to the United States to visit Respondent in August 2018. On October 15, 2018, Petitioner returned to Japan without the Child to seek medical treatment. At that time, Respondent agreed to send the Child back to Japan; however, Respondent failed to return the Child to Petitioner in Japan.

**2. Affirmative Defenses**

As to Respondent's Affirmative Defenses, evidence was presented through Petitioner's medical records, Petitioner's testimony, and Respondent's testimony as follows:

According to Petitioner's medical records/summaries, beginning in April of 2015, and to as recently as November 24, 2017, Petitioner was hospitalized voluntarily and involuntarily to inpatient psychiatric facilities during the following dates:

1. April 6, 2015 to April 13, 2015 - Involuntarily admitted for 8 days after "voicing incoherent complaints," "refus[ing] medications," and "being violent against her

husband." Petitioner was "discharged before [her] treatment finished", and "her father took a leave of absence to attend to [her] needs." Because Petitioner's medications made her extremely sleepy and "impaired her ability to raise her son," she was re-hospitalized on April 24, 2015.

2. April 24, 2015 to June 11, 2015 - Involuntarily admitted for 49 days. Upon discharge Petitioner felt uneasy about "picking up her child from the daycare center." In July of 2015 Petitioner "practiced picking up her son from the daycare center, and was able to more or less do it."

3. July 24, 2015 to August 6, 2015 - Voluntarily admitted for 14 days upon feeling "immense frustration" with caring for the Child with no cooperation from her husband, and upon having "suicidal thoughts." Around the time of Petitioner's discharge she complained of "uneasiness with child-raising."

4. August 20, 2015 to September 4, 2015 - Voluntarily admitted for 15 days for suicidal thoughts and low energy. Upon admission Petitioner's "suicidal thoughts immediately disappeared, but she continued to feel uneasy about child-raising."

5. October 23, 2015 to October 26, 2015[1] - Petitioner admitted for 4 days after she "started to act out in rage and tried to jump off the veranda of her apartment" to commit suicide, "but her husband held her back. [Petitioner] grabbed a kitchen knife to prevent her husband from stopping her."

6. July 18, 2016 to August 4, 2016 - Admitted for 17 days at Negishi Hospital after Petitioner "became excited and screamed for help," and "was held in the custody of the Harajuku police" department on July 16, 2016.

7. August 12, 2016 to August 31, 2016 - Petitioner was "[r]e-admitted to Negishi Hospital" for 20 days "due to narrowed field of vision."

8. September 12, 2016 to November 4, 2016[2] - Admitted for 52 days (involuntarily for 19 days then voluntarily for 33 days) after Petitioner "started to feel bad" on September 10, 2016, and "went out to the balcony" and "was monologuing."

---

[1] It appears Petitioner did not have an overnight hospital admission for 9 months between October 26, 2015 and July 18, 2016.

[2] It appears Petitioner did not have an overnight hospital admission for 12 months between November 4, 2016 and October 21, 2017.

9. <u>October 21, 2017 to November 24, 2017</u> – Involuntarily admitted for 34 days after Petitioner "was talking to herself," and during an argument with her husband, Petitioner threw "food and backpacks, etc. at her husband and started banging on her own chest…and called the police." Petitioner's mother advised police to "admit her to the hospital…I am afraid of her." Upon hospitalization, Petitioner was kept in isolation for the first 16 days, kept in waist restraints for the first 9 days, and kept in both waist and arm restraints for the first 4 days.[3]

Petitioner testified as follows:

1. The Child began "24 hour care" in April of 2015 because Petitioner was "hospitalized … and nobody [could] take care of [the Child during] the day, so he needed to go inside the 24 hour[] care." (Tr. 27).

2. When Petitioner was hospitalized on October 23, 2015, she has no memory of the suicide attempt because she was in a manic state from her manic depression. (Tr. 38). Petitioner was "not serious" about climbing over the balcony. (Tr. 48).

3. Petitioner doesn't remember attempting to walk in front of a train. (Tr. 49).

4. The Child "stopped attending [the 24 hour care in March of 2016] I think." (Tr. 28).

5. Petitioner has tried to harm herself, but "[i]t wasn't serious. I just took my medication too much … I knew it was not fatal because my medication can't kill myself." (Tr. 30-31).

6. Petitioner's October 2017 hospitalization stemmed from Respondent hitting and bruising Petitioner's mother, Respondent hitting and breaking a wall, and Respondent punching Petioner. (Tr. 40).

7. Petitioner left the United States on October 15, 2018, to go back to Japan to see her doctor early without Luke (Tr. 10).

8. Petitioner cared for the Child full time from birth to six months, and (outside of hospitalizations) has cared for the Child full time on Saturdays and Sundays. (Tr. 17).

Respondent testified as follows:

1. Respondent lived in Japan from June 2, 2012 until January 7, 2016. (Tr. 80).

---

[3] It appears Petitioner has not had an overnight hospital admission for the past 16 months since November 24, 2017.

2. Respondent moved to Missouri in January of 2016 until the spring of 2016. (Tr. 81).

3. Respondent moved to Japan in the spring of 2016 until May of 2018. (Tr. 81).

4. In May of 2018 Respondent moved back to the United States to live in Missouri permanently. (Tr. 81).

5. From May of 2018 until August 15, 2018, the Petitioner and the Child have been living with the Petitioner's mother in the mother's apartment in Japan. (Tr. 84).

6. From May of 2018 until August 15, 2018, the Petitioner's mother has been providing care for the Child. (Tr. 84-85, 103).

7. Petitioner and the Child flew alone to Missouri on August 15, 2018, to visit Respondent. (Tr. 87).

8. While visiting in the United States, Petitioner and Respondent argued, wherein Petitioner threw a cup and Respondent and threatened to kill Respondent. (Tr. 90).

9. Petitioner then traveled to Florida for two weeks. Upon Petitioner's return to Missouri, she informed Respondent that she wasn't feeling well and she didn't want to take care of the Child. Petitioner then returned to Japan in October of 2018. (Tr. 88-91, 95).

In response to Respondent's Affirmative Defenses, Petitioner testified that her current treating physician is Dr. Nakanishi. Dr. Nakanishi is aware of Petitioner's bipolar disorder and history of hospitalizations. Petitioner began seeing Dr. Nakanishi in January 2018, and she has appointments with Dr. Nakanishi every three weeks. Dr. Nakanishi provided a note, dated February 27, 2019, that Petitioner can care for her child despite her bipolar diagnosis. (Petitioner's Exhibit 5.)

### Grave Risk of Harm

To succeed on a "grave risk" defense, Respondent must prove by clear and convincing evidence that "there is a grave risk that [the Child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b). "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Acosta v. Acosta*, 725 F.3d 868, 876 (8th Cir. 2013). Article 13(b) recognizes two types of grave risk: (1) cases where a child is sent to a war zone or zone of famine or disease; or (2) cases involving serious abuse or neglect. *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011). The determination is narrow in scope:

> [It] does not include an adjudication of the underlying custody dispute, and only requires assessment of whether the child will face immediate and substantial risk of an intolerable situation if he is returned to [his home country] pending final determination of his parents' custody dispute. It is not relevant to this Convention exception who is the better parent in the long run.

*Id.* (citation omitted).

The party seeking to invoke the exception must show that the grave risk of harm is more than what would normally be expected when taking a child away from a parent and giving the child to another parent. *Nunez v. Escudero v. Tice-Menely*, 58 F.3d 374, 377 (8th Cir. 1995) (internal quotation marks and citation omitted). To ensure that the child is adequately protected, the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence. *Id.* at 377-78 (internal quotation marks and citation omitted). *See also Currier v. Currier*, 845 F. Supp. 916, 923 (D.N.H. Mar. 16, 1994) (to determine grave risk, the court must evaluate the surroundings of the habitual residence and basic personal qualities of those located there).

Nonetheless, the Court has minimal medical records concerning Petitioner's visits with Dr. Nakanishi or any medical records after Petitioner's discharge from the NTT Medical Center in November 2017. The Court is missing the crucial medical records of Petitioner for the most recent eighteen months. Before the Court can determine whether Petitioner presents a grave risk of danger to the Child, the Court must review Petitioner's medical records after her discharge from the NTT Medical Center to present date.

The Hague Convention contemplates resolution of Hague Convention petitions within six weeks of their filing. *See* Convention art. 11 ("If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the application . . . shall have the right to request a statement of the reasons for the delay."). *See also* 22 C.F.R. § 94.6(h) (1995) (requiring United States authorities, upon request, to seek a report on the status of the court action if no decision has been reached after the pendency of the action for six weeks). Here, while the Court understands the expeditious nature of Hague Convention petitions, the Court must review Petitioner's recent medical history to determine if the grave risk exception applies. Accordingly, good cause exists to extend the determination on the merits of this matter.

## Conclusion

After careful consideration of the evidence, the Court requires Petitioner's mental health records beginning January 2018 through present date before the Court can determine whether the grave risk exception would apply to prevent the Child's return to his habitual residence. Accordingly, the Court **ORDERS** the following:

(1) Respondent's request to bifurcate the trial and produce additional evidence is **GRANTED**;

(2) Respondent's Discovery Motion (Doc. 24) is **GRANTED in part** and **DENIED in part** as discussed above;

(3) Petitioner is **ORDERED** to provide the Court and Respondent with her medical records, or a sufficient summary, from November 2017 to present date;

(4) The Child shall remain with Respondent until the Court is provided with these records and can determine whether the Child would be in grave risk if returned to Japan; and

(5) The Temporary Restraining Order entered on February 23, 2019 (Doc. 7) has expired. A preliminary injunction is issued as to the following: (a) the Child's passport(s) shall remain in the custody of the Springfield District Court's Clerk's Office until this Court orders otherwise, (b) Respondent is prohibited from removing the child from the Western District of Missouri until resolution of this matter, and (c) no person acting in concert or participating with Respondent shall take any action to remove the Child from the Western District of Missouri, until resolution of this matter.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: April 2, 2019